CASE 92.—PROCEEDINGS TO CONTEST AN ELECTION FOR
COUNCILMAN OF THE CITY OF PRINCETON BY
JOHN G. ORR AND OTHERS AGAINST J. U. KEVIL
AND OTHERS.—February 22.

## Orr, &c., v. Kevil, &c.

Appeal from Caldwell Circuit Court.

J. F. GORDON, Circuit Judge.

Judgment for defendants. Plaintiffs appeal. Reversed.

1.  Elections—Validity of Ballots—Signature of Clerk—Necessity.
    —Under Ky. Stats., 1903, sec. 1471, providing that no ballot
    shall be rejected for any technical error which does not make
    it impossible to determine the voter's choice, the absence of
    the clerk's name on the backs of a ballot does not invalidate it.
2.  Same — Contest — Fraud — Record — Evidence — Sufficiency.—
    Under Ky. Stats., 1903, sec. 1596a, subsec. 12, providing that if
    it shall appear from an inspection of the whole record that
    there has been such fraud, intimidation, bribery, or violence
    in the conduct of the election that neither contestant nor
    contestee can be adjudged to have been fairly elected, the
    circuit court, subject to revision by appeal, or the court of
    appeals finally, may adjudge that there has been no election,
    etc., the record and evidence in an election contest examined,
    and held to show such fraud and bribery in the conduct of
    the election as to avoid the same.
3.  Same—Judges of Election—Cities of the Fourth Class—
    Council.—Ky. Stats., 1903, sec. 3486, providing that the board
    of council of a city of the fourth class shall judge of the
    eligibility and election return of its members, etc., has no
    application to a case of an election of councilmen contested
    on the ground of fraud and bribery in the conduct thereof.

R. W. LESANBY and P. H. DARBY for appellants.

JOHN C. GATES for appellees.

OPINION OF THE COURT BY JUDGE BARKER—Reversing.

Princeton is a city of the fourth class, and its municipal legislature is composed of six councilmen elected by the city at large. At the general election held on November 7, 1905, the appellants were nominees on the Republican, and the appellees nominees on the Democratic, ticket for the offices of councilmen for the ensuing term. After the election, the returns were canvassed with the result that it appeared that appellees received votes in the aggregate running from 247 to 260, and the appellants from 226 to 238. Taking the highest vote received on the Democratic ticket, 260, and deducting therefrom the lowest received on the Republican ticket, 226, which is most favorable to appellees, there was only a difference of 34 votes between the vote received by the two tickets. Certificates of election were issued to appellees, and they were inducted into office; thereupon this action was instituted under subsection 12 of section 1596a, Ky. Stat., 1903, to contest the election. Without analyzing its allegations with minute particularity, in our opinion the petition states a valid cause of action for contesting the election of appellees. It is alleged that appellants received at the election a majority of all the legal votes cast, and that they were duly and legally elected and entitled to the offices in question; and there is pointed out certain specific frauds and wrongs done, the result of which made it appear that appellees were elected. Appellees in their answer denied the material allegations of the petition, and alleged affirmatively their own election and right to be councilmen of Princeton. These affirmative allega-

tions being controverted, the issues were complete. Princeton has five election precincts; four of them were carried by the appellees by small majorities; "No. 2" was carried by the appellants by a much larger majority than was received by the appellees in any one of their precincts. So far as this case is concerned, we shall confine ourselves to an examination of the claims of wrong done in the election at precinct "No. 2." These are, first, that there were a large number of votes cast for the appellees by voters who were bribed, and that these, in order to carry out the corrupt bargain between them and the appellees, formed themselves into a club called the "Independent Club," of which one Joe Morrow was president, and agreed upon the following plan by which it was to be known afterwards that they voted the Democratic ticket; each was to vote under the Democratic device and within the circle around it by making two distinct impressions with the stencil, and wherever such a mark was found, it was to be considered that the corrupt agreement had been carried into effect; second, the 35 legal ballots were wrongfully thrown out because the clerk's signature was not on the backs thereof, all of these being straight Republican votes. There were other allegations in the petition, in general terms tending to show other frauds and corrupt practices at the other precincts, but we shall not notice these further. The case was submitted for final judgment alone, on plaintiffs' (appellants') testimony, and the court entered a judgment dismissing their petition, and of this they are now complaining.

The testimony for the appellants showed the formation of the Independent Club, composed of negroes, who ordinarily voted the Republican ticket; that this club met from time to time just prior to the election, and agreed to vote for the Democratic nominees for

pay, and adopted the ruse of the double impression of the stencil as a means of showing that their corrupt bargain had been carried out, and that they were entitled to the bribery money; that, after the election, when the ballots at precinct "No. 2" were counted, it was found that there were 18 of these votes bearing the double impression of the stencil, and that several days later the club met again, and the president, Joe Morrow, distributed among the members the sum received for their votes. It was also shown without contradiction that the Democratic clerk at precinct "No. 2," while counting the ballots, asked the Republican challenger or inspector if he knew what the double impression which appeared upon some of the ballots meant, and upon receiving a reply in the negative, explained that it represented the negro votes which they (the Democrats) had bought. It also appears without contradiction, that there were 26 ballots found in the box which did not have the clerk's name upon the back thereof; that three of these were opened by being unfolded, and found to be straight Republican votes; thereupon the Democratic judge objected to the opening of any more of these ballots, and insisted that all of them be rejected; and this was done over the protest of the Republican judge. It appears that the Republican sheriff was unwilling to take any positive stand in the matter, and practically allowed it to go by default. It was supposed that these 26 ballots were placed in the box with the other returns of the election, but, when the trial was had, they could not be found, and no account of them or their final disposition was ever ascertained.

Before taking up the legal propositions involved in this record, we will give with more particularity some of the testimony introduced by appellants, so that it may be seen that the general statements of the facts

heretofore made is sustained by the details. The appellees did not introduce any evidence whatever. W. W. Moore, the Republican challenger at precinct "No. 2," testified positively as to the 26 ballots being considered spoiled because the clerk's name was not written on the backs as by law required, and not counted for this reason. The official certificate of the officers of election shows that 26 ballots were marked "spoiled and not counted," and as Moore's evidence could have been readily disproved if untrue, we assume, in the absence of any effort to contradict him, that what he says on the subject is true, and that the 26 ballots were not counted, alone for the reason of the absence of the clerk's name on the backs. Moore also testified, without contradiction, to a conversation between him and the Democratic clerk, R. L. Pepper, during the count of the ballots. In response to a question asked him, the witness said: "Mr. Pepper, clerk of the election, some time during the counting, asked me if I knew why there was two stencil marks put under the Democratic device, and I told him I did not, and he said, 'I do,' and I says, 'Why were they put there.' and he said 'That's the negroes we bought, and we had them to vote that way so that we would know that they had voted the way they said they would.'" We think it significant that this Democratic clerk thus in advance detailed the particulars of the corrupt bargain by which the Independent Club was bribed, as was afterwards shown by the evidence, and also that this clerk, who knew so much about the bribery that was done and included himself in it by the use of the pronoun "we," should have omitted to put his name on so many ballots when this omission, from his view of the law, would disfranchise the voters. As Pepper did not contradict or explain the conversation detailed by Moore, we acecpt it as true. Dan Hillman, a negro,

in response to a question about the agreement of the Independent Club, said: "The agreement was made; it was for them to stamp their ballots and stamp twice, and Joe Morrow got up that night and made a speech and told them all that was going to vote to stamp their ticket twice, and there was three or four of us present at that time, and he said that would show if they voted, and that was the understanding among all of them, and then he went around the morning of the election and told them that, if they didn't vote that way, it was lost. Q. What place on the ballot were they to stamp twice? A. Right under the rooster in the wheel." Oliver Baker, a negro, corroborated Dan Hillman on the method adopted for voting so that it could be definitely ascertained how the members voted. William Crump made this statement as to Joe Morrow, the president: "Out there at the voting precinct at Mr. White's shop, Joe says to me, 'We are going to vote 50 negroes to-day.   *   *   *' I says: 'They won't do it.' He says, 'I'll bet you a $1 to the man, $50;' and I says, 'Well, how do you know;' and he said. 'We have two marks on them, and we can tell how they vote.' He says: 'There goes one of my men now.' He just said when the fellow came out, 'Well, you fixed it all right,' and the fellow said 'Yes,' and they went off." Dan Hillman was recalled, and said: "I was at Boaz's saloon, in Princeton, about 10 or 11 nights after the election, somewhere along there, when he (Joe Morrow) was paying off. There were 12 or 14 come after I got there—they paid off." Press Harris stated that the night before the election he attended a meeting of the Independent Club held at the room of the Democratic campaign committee; that there were about 20 of the club there; that several of the campaign committeemen, whose names he gave, were present, among whom was the

Democratic nominee for mayor. As has been said before, none of this testimony for the appellants was contradicted, although, if untrue, it was easy to disprove it. We are, therefore, forced to the conclusion that it must be accepted as true.

The 26 ballots, whose only infirmity was the absence of the clerk's name on the backs, should have been counted.. In section 1471, Ky. Stats., 1903, it is provided: "No ballot shall be rejected for any technical error which does not make it impossible to determine the voter's choice." In Keller v. Ferguson, 71 S. W., 75, 24 Ky. Law Rep., 1205, on this subject, it was said: "There appear five ballots which were rejected by the election officers because not signed by the clerk. Both parties to these records have argued in support of the proposition that, where the clerk of election fails to sign his name upon the back of the ballot, as required by the statute, whether by design or through inadvertance, the ballots should not be rejected merely on account of such failure. The trial court so decided, and, in our opinion, correctly. The principle should be borne in mind that, as to duties required of the voter himself and duties required of election officers, a different rule prevails, and that, when officers of election, by neglect or fraud, fail to perform their duty, in a matter over which the voter has no control, the inclination of the courts is always that the voter shall not suffer by reason of the negligence of the officers, and, while the provision may be regarded as mandatory with regard to the officer, and his failure may subject him to punishment, it shall not disfranchise the voter who is not guilty of the violation. McCrary on Elections, sections 225 and 283; Payne on Elections, section 528." To the same effect is Herndon v. Farmer, 114 Ky. 200, 70 S. W.

632, 24 Ky. Law Rep., 1045, and Pettit v. Yewell, 113 Ky., 777, 68 S. W., 1075, 24 Ky. Law Rep., 565.

Although we have no trouble in reaching the conclusion that the 26 ballots under discussion should have been counted, inasmuch as they have been lost or destroyed it connot now be told certainly for whom they were voted, and deducting the 18 corrupt votes purchased from the Independent Club from the Democratic vote will not elect appellants. Upon this showing it is clear that appellants were not entitled to a judgment declaring them elected to the offices in question, but it remains to be ascertained whether or not the showing of fraud, which is so clearly established in this case, entitles appellants to a judgment declaring the election void, and the offices vacant. We do not believe that the omission of the clerk's name from the backs of so many of the ballots cast at precinct "No. 2" was the result of honest mistake or inadventance upon the part of that officer, and we are encouraged to reach this conclusion by the fact that this particular officer, by uncontradicted evidence, was shown to be conversant with the bribery frauds that were carried on, and by his own admission was a participant in it. An election officer, who so far forgets the sanctity of his oath as to participate in one kind of fraud at an election, can readily be believed to be willing to commit any other which the necessity of his party requires, and the opportunity of his position permits. It requires little knowledge of the methods of election frauds in modern times to appreciate how easily a close election could be turned by a shifty and resourceful clerk omitting his name from the backs of the ballots of ignorant and unwary voters, if this would suffice for the accomplishment of the evil design. Our conclusion on this subject is

strengthened by the fact that the Democratic officers at this precinct believed that the omission of the name of the clerk on the ballots would disfranchise the voter, and they tried to effectuate the fraud by actually refusing to count, or even open, the ballots lacking the clerk's signature. Deducting the 18 corrupt votes from the majority of 34, received by the Democratic ticket, would leave a majority of only 16. It is, therefore, evident that these 26 votes, which were wrongfully thrown out without being counted, could more than overcome this majority, and carry the election for the other side. Of course, as the ballots were never opened, and were either destroyed or have become otherwise lost, it cannot now with certainty be determined that appellants would have received enough of these uncounted votes to elect them. Considering the fact that the three ballots of the 26 which were opened were straight Republican votes, that the Democratic officers refused afterwards to open any others of the 26 ballots, that their infirmity was the result of a Democratic clerk's omission of duty, and the mysterious loss of the ballots themselves, we are led to the conclusion that the whole procedure with reference to them was a part of the same scheme to carry the election by fraud which was commenced before election day by the formation and purchase of the Independent Club.

In subsection 12 of section 1596a, Ky. Stats., 1903, regarding the contesting of elections as to certain offices, it is provided: "In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the court of appeals finally may adjudge that there has

been no election. In such event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify.'' It would seem, then, that we have here a condition to which the language of the statute applies with full force and effect; a case where it appears from an inspection of the whole record that there has been such fraud and bribery in the conduct of the election that neither the contestants nor contestees can be adjudged to have been fairly elected. In construing this language of the statute, and applying it to a contested election, we said in the case of Stewart v. Rose, 72 S. W., 271, 24 Ky. Law Rep., 1759: "But where the illegal voting, the bribery or fraud or intimidation has prevailed so that its effect upon the result is such that no degree of certainty exists as to the fairly expressed will of the electors, the election should be declared void. The voters of the district or community affected by it are entitled to an opportunity, by a fair election, to select their officials. It is of the first importance to the people that their rights, before the claims of rival candidates, be protected and preserved.'' The same principle is recognized in Wilkins v. Duffy, 114 Ky. 111, 70 S. W. 668, 24 Ky. Law Rep., 21, 913, 968. It cannot be successfully maintained, that the contestees under the charter of cities of the fourth class can be held to be judges of their own election. It is true, in sec. 3486, Ky. Stats., 1903, it is provided: "It (the board of council) shall judge of the eligibility and election returns of its members'' * * * —but it is manifest that this should have no application to a case like the one under discussion. It never was the law that one could be a judge of his own case. At common law all such judgments were void, as they must be held under every rational system of judicature or governmental policy. No statute should be construed

to mean what would be absurd, and what could be more absurd than the submission to a board of councilmen of the question whether they, or their opponents, had been legally elected? This proposition needs no citation of authority, but, in the case of Keller v. Ferguson, supra, there was involved the election of councilmen for Georgetown, Ky., a city of the fourth class, as is Princeton, and in that case this court took jurisdiction of the contest between the rival candidates, and reversed the judgment of the circuit court on the question.

In reaching the conclusion that the election involved in this case should be held void, and the offices claimed by the parties litigant vacant, we are not unmindful of the force of the argument that courts ought not, for light and trivial causes, undo the work of the officers having in charge elections by the people. On the other hand, we appreciate the importance to the people of a watchful supervision on the part of the courts to enforce all those statutory safeguards which the representatives of the people have provided to circumvent the machinations of those who, by fraud or intimidation, seek to render abortive their will as expressed at the polls. Nor must it be forgotten that an election tainted with fraud or controlled by intimidation or violence is not an election by the people, but one held despite them. The people of Kentucky have not been unmindful of the blessings certain to flow to them from that right of a free and equal election so sacredly preserved in their Bill of Rights, and therefore, they have devised a system of laws which, if honestly followed and enforced, secures to every deserving citizen the right to cast his ballot in accordance with his will and choice, and have it counted as cast. Nor have they, on the other hand, been unappreciative of the evils certain to flow from

elections which are not "free and equal," and they have provided a system of pains and penalties which, if rigorously and intelligently applied, insures the swift and condign punishment of every violator of the right of the people to govern themselves by free and equal elections. Our election laws are, therefore, among the most, if they are not the most, important of all the statutes which safeguard the rights of the people. Whenever elections are not free and equal, the democratic principle is dead, and republican form of government will exist only in name. A people may lose their liberty while retaining the name and form of democracy. The freedom of republican Rome was lost in the despotism of the empire when, by law, it was death even to suggest a return to monarchy, and of a great and highly civilized people it has been eloquently said, in contrasting their civilization with that of the English: "And, although they attempted to introduce into their country municipal institution, all such efforts were futile, for, while they copied the forms of liberty, they lacked that bold and sturdy spirit by which alone liberty can be secured. They had, indeed, its image and superscription, but they wanted the sacred fire that warms the image into life. Everything else they possessed. The show and appliances of freedom were there. Charters were granted to their towns, and privileges conceded to their magistrates. All, however, was useless, for it is not by the wax and parchment of lawyers that the independence of men can be preserved. Such things are the mere externals. They set off liberty to advantage; they are as its dress and paraphernalia—its holiday suit in times of peace and quiet. But, when the evil days set in, when the invasions of despotism have begun, liberty will be retained, not by those who can show the oldest deeds

and the largest charters, but by those who have been most inured to habits of independence, most accustomed to think and act for themselves.    *    *    *"
Buckle's History of Civilization, vol. 1, p. 448.  It is, therefore, of the highest importance that the courts should scan the conduct of elections with deep interest and jealous care, and enforce with vigor the laws provided for discouraging fraud and violence.  One of the most important parts of these laws is the statute under consideration, which enables the courts to deprive the candidate apparently elected of the fruits of fraud when this is established, although the office cannot be given to his opponent.  It is not often that fraud is so surely entangled and held in the meshes of its own chicanery that it can be definitely measured, or its influence accurately weighed, but generally diligence will so expose its insidious work as to justify the courts in withholding the fruits of its evil doing, and thus depriving it of its highest incentive.  And, if this be not done when the facts justify it, then elections will become simply contests of fraud and violence, and the political boss will come into his own. "By merit raised to that bad eminence."  Then will come a time when to this newly made ruler we may apply (mutatis mutandis) the language of the historian in picturing the greatest demagogue who ever ruled by fraud and violence:  "He understood the fearful and sinister secret of how men may be robbed of their property by writing the word 'jury' into their laws.  How a nation may be snared by universal suffrage; and the liberty of a people strangled in the nighttime with a thing he called an election."  Those who believe in the perpetuity of government by the people must rest their hopes in the virtue of the people, and, unless this vitalizing principle is unshackled in its exercise, such government cannot

exist, and it matters little whether, in speaking of the mere machinery of a government which has lost the spirit of liberty although retaining its outward semblance, we use the word "Czar" or "Governor," "Douma" or Legislature," Ukase" or "Statute," "Cassock" or "Policeman," the practical result is the same, for absolutism has been attained.

The judgment is reversed, with directions to the trial court to enter a judgment holding the election void and the offices vacant.

JUDGE NUNN—Dissenting.

If there was sufficient fraud to invalidate the election, which I doubt, there is not the slightest evidence that the appellees had any knowledge of or took any part in it. For this reason I dissent.