## Marilla, et al. v. Ratterman, et al.

## Howell, et al. v. Carrell, et al.

## Curry, Sr., et al. v. McCandless, et al.

(Decided June 12, 1925.)

## Appeals from Jefferson Circuit Court
### (Chancery Branch, First and Second Divisions).

1. Elections—Conspiracy Charge Against Contestees to Secure Ineligible Votes Not Sustained.—In election contests, evidence held not to sustain charge of conspiracy in behalf of contestees to cause persons not entitled to vote to be registered as voters.

2. Elections—Charge of Conspiracy of City Administration to Secure Election of Contestees by Unlawful Means Not Sustained.—In election contest, evidence held not to sustain charge that members of city administration conspired to secure election of contestees by any unlawful means.

3. Elections—Similarity of Illegal Methods in Various Precincts Sufficient to Show Conspiracy Among Election Officers and Precinct Workers.—In election contest, evidence held to show a similarity in conduct of election officers representing contestees, tending to prove existence of agreed concert of action among election officers and precinct workers to procure all votes possible for contestees by legal or illegal methods.

4. Elections—Agreement of Election Officers Cannot Validate Invalid Votes.—Kentucky Statutes, section 1475, regulates manner of voting by illiterate, blind, and physically disabled persons, and agreement among election officers for rendering unlawful assistance to voters cannot validate their invalid votes.

5. Elections—Essential Requirements Stated.—Essential requirements of valid election are that it be free and equal, that ballot be secret, and that provisions of statutes necessary to effect those ends be observed.

6. Elections—Irregularities of Election Officers and Voters, Not Affecting Merits, will Not Vitiate Election.—Mere irregularities of election officers and voters, not affecting merits nor fairness of case, fairness and equality of election, or secrecy of ballot, will not vitiate election or affect validity of a vote.

7. Elections—Assistance to Voter in Booth Requires Rejection of Vote.—Where election officer or other person goes into booth with voter and assists him in stenciling ballot, vote should be rejected whether or not voter is illiterate.

8. Elections—Marking Ballot or Pointing Out to Voter where to Stencil it, Unless Illiterate, Requires Rejection.—Where election official marks ballot of voter with pen or pencil or points out on ballot where to stencil it, without voter's having sworn that he

cannot read or is blind or physically disabled, under Kentucky Statutes, section 1475, ballot should be rejected, notwithstanding voter may then go into booth to stencil ballot.

9. Elections—Stenciling Ballot by Election Officer or Another, Requires Rejection, Unless Voter is Blind or Disabled.—Stenciling by officer of election or another, of ballot of voter requires rejection of ballot, unless voter is blind or physically disabled and has taken an oath to that effect, under Kentucky Statutes, section 1475.

10. Elections—Ballot Stenciled Openly by Voter Must be Rejected.— Ballot stenciled openly by voter must be rejected, notwithstanding voter may have taken illiterate oath, under Kentucky Statutes, section 1475.

11. Elections—Ballot of Blind or Physically Disabled Voter May be Stenciled Openly for Him.—Under Kentucky Statutes, section 1475, where voter is blind or physically disabled so that he cannot stencil his ballot and he has taken oath to that effect, ballot may be lawfully stenciled for him openly.

12. Elections—Voluntary Exposure of Ballot by Voter Requires Rejection.—Voluntary exposure by voter of his ballot, so that secrecy is destroyed, requires rejection of vote.

13. Elections—Election Not Void for Failure of Clerk or Officer to Fulfill Requirement.—Failure of clerk to write his name upon ballot or remove secondary stub from ballot, or of election officers to take oath of office or make return in proper form, does not render election void.

14. Elections—Irregular Omissions of Clerk or Election Officers Evidential of Fraud.—Failure of clerk to write his name upon ballot or remove secondary stub from ballot, or of election officers to take oath of office or make return in proper form, may be received as evidence of fraud in election.

15. Elections—Validity Upheld, if Possible.—Validity of an election will be upheld by courts, if reasonable or possible, and it will not set it aside for light and trival causes.

16. Elections—Result Determined by Legal Votes Cast, if Either Candidate can Show he Received a Majority.—Where there has been fraud, intimidation, bribery, illegalities, or irregularities in an election and results of those influences can be eliminated, so as to clearly ascertain result effected by legal voters, court will sustain election, but if court cannot with reasonable certainty determine who has received majority of legal votes cast, election should be set aside.

17. Elections—Inability to Determine Legal from Illegal Votes in Precinct Held to Eliminate Entire Precinct.—In election contest based on charge of illegal votes, illegal methods of voting and illegal conduct of election officials, impossibility in some precincts to determine which were legal and which were illegal votes, held to eliminate whole precinct.

18. Elections—Evidence Sufficient to Show Illegal Voting and Conduct of Election Ocicials in Number of Precincts.—In election contest,

evidence held to show such illegal voting and illegal conduct of election officials as to render it impossible to determine legal votes.

19. Elections—Precinct is Unit of General Election, and May be Disregarded and Cast Out on Sufficient Showing of Illegality.—Where determination of ballot votes is in question, a precinct is unit of general election, and may be disregarded and cast out when it is impossible to determine which are legal and illegal votes and their numbers, and for whom cast.

20. Elections—Official Returns Presumed Correct.—In election contest, official returns are presumed correct, and to overturn them contestant must show with reasonable certainty that he was elected.

21. Elections—Contestants Not Elected for Failure to Show they Received Majority of Legal Votes.—Contestants not elected, where neither showed with reasonable certainty that he had received majority of legal votes.

MARK BEAUCHAMP, LAWRENCE MACKEY, KENDRICK R. LEWIS, E. P. HUMPHREY, W. T. McNALLY, LAWRENCE GRAUMAN, JOHN B. BRACHEY, NEVILLE MILLER, BEN H. SACHS, MAURICE HORVITZ, WALTER P. LINCOLN, MUIR WEISINGER, BEN F. EWING and GARDNER K. BYERS for appellants.

RICHARD PRIEST DIETZMAN, JOSEPH E. CONKLING, R. RUTHENBURG, WM. A. EARL, R. F. PEAK, CHARLES REISCH, FRED STARCK, GROVER G. SALES, J. P. MILLER, W. C. GOODWYN and FRANK A. ROPKE for appellees.

OPINION OF THE COURT BY HURT, SPECIAL JUDGE—Affirming as to certain appellees and reversing as to others.

These three appeals were taken upon the same record. The cases were tried and determined together in the circuit court, and the appeals from the judgment of that court in the three cases were heard and tried together in this court. The causes of action are the same in each case, the defenses are the same, and the evidence is the same in each case. They grow out of the contests for the offices of park commissioners, aldermen and councilmen, in the city of Louisville, at the election held in November, 1923. At that election the following named appellants were the nominees of the Democratic party, for the offices of councilmen, for the following wards, respectively: For the 1st ward, E. Louis Marilla and Henry W. Kraut; for the 2nd ward, Harry H. Martin and Frank E. Akers; for the 3rd ward, Edward Buckner, and

Edward Wunderlin; for the 4th ward, William G. Willen and W. H. Dennes; for the 5th ward, Maurice Horvitz and Frank F. Fleming; for the 6th ward, Ben F. Ewing and John B. Brachley; for the 7th ward, John Hennessey and Peter Mueller; for the 8th ward, Harry E. Myers and E. L. Wright; for the 9th ward, Len Guernsey and Geo. W. Clark, Sr.; for the 10th ward, James M. Donahue and Al Steiger; for the 11th ward, E. G. Harrison' and William W. Schackleiter; and for the 12th ward, George Isaac Jones and Karl L. Badger. The following appellees, were the nominees of the Republican party for the offices of councilmen for the following wards of the city, respectively: For the 1st ward, Mrs. Ray G. Ratterman and Edward H. Meyers; 2nd ward, Edward G. Fernow and N. M. Sanders; 3rd ward, William G. Lutz and Henry V. Denzer; 4th ward, William J. Watson and Hubbard R. Petty; 5th ward, Jacob L. Isaacs and Chas. H. Lindley; 6th ward, Cullis A. Carder and Robert H. Lauder; 7th ward, Chas. F. Baird and Don Warren; 8th ward, Chester H. Koch and Chas. I. Jones; 9th ward, J. E. Payton and William J. Fehler; 10th ward, Fred Ohmann and J. L. Awtry; 11th ward, Mrs. Henrietta Sloan and J. Fred Heatkenmeier, Sr., and for the 12th ward, J. E. Sikking and William J. Brown.

The appellants, Mrs. W. Bayse Howell, R. Ray Head and I. Sydney Jenkins, were the nominees of the Democratic party for the offices of park commissioners, while the appellees, Dan Carrell, John E. Heyburn and Alex E. Johnson were the nominees of the Republican party for the same offices.

For alderman, the appellants, Lee Curry, Sr., B. J. Campbell, Jr., Henry J. Rueff, McKay Reed, Robert B. McDowell, W. P. Bradenburg, Benjamin H. Sachs, Mark Beauchamp, S. J. Brownstein, Ed Korb, Carl A. Jackman and John F. Singhiser were the nominees of the Democratic party, while the appellees, Clay McCandless, Robert L. Hawes, Harry A. Voltz, Geo. W. Stege, Ralph S. Towle, Z. T. Miller, E. D. Morton, Sam H. Stone, Henry Kaufman, Edward Schoppenhorst, Ernest F. Horn, and Authur A. Will were the nominees of the Republican party.

The official returns of the election showed the election of each of the Republican candidates for park commissioners, aldermen and councilmen. In due time, the Democratic candidates filed actions against their oppo-

nents for the purpose of contesting their elections to the respective city offices, and prayed in the alternative to either declare them elected to the respective offices for which they had been candidates instead of their Republican opponents, or in the event that could not be done, to declare and adjudge that the offices were vacant, and that no one had been elected thereto. In the course of proceedings, a recount was made of the votes cast in 130 precincts of the city. This recount was made by a commissioner of the court, who caused the ballot boxes to be opened, and made and reported to the court a count of all the ballots found in the ballot boxes of these precincts, and a showing of the number of votes, according to the ballots, received by each of the candidates. Upon this recount, each of the Republican candidates received a considerable number of votes, less than they were shown by the official returns to have received, which was caused by the election officers, either incorrectly counting the vote, or by failing altogether to count it, and certifying to returns, which gave to the Republican candidates from 639 to 383 more votes than they received in these precincts and to the Democratic candidates from 22 to 249 less votes, than they received. Adopting the recount as a correct tabulation of the votes received by each candidate in the 130 precincts recounted and deducting from the votes shown by the official returns to have been received by each Republican candidate, the number lost by him upon the recount, and adding to the vote shown by the official returns to have been received by each Democratic candidate, the number of votes gained by him upon the recount, still the contestees each received majorities over the contestants in each of the races and for each office, but reduced in amount from the official returns.

The appellants, who will hereinafter be called the contestants, charged that the officers of the city government, and those desiring and expecting offices, in the event the appellees, who will hereinafter be called the contestees, should be elected to the offices for which they were candidates, and other persons, who were partisans of theirs, previous to the registration of the voters for the election, entered into a conspiracy to procure the election of the contestees by force, fraud, intimidation, illegal voting, and whatever unlawful means might be found necessary to effect that result, and in furtherance of that purpose procured through their agents, the regis-

tration of many persons, who are not legal voters, and finally consummated the purpose of the conspiracy, on the day of the election, through the officers of the election and such voters, as would participate in the unlawful procedure, some of whom were illegal voters, and some of whom were lawfully entitled to vote, but, who cast their votes and were permitted to do so, in an illegal manner; that said illegal voters and voting was aided, assisted and instigated by various members of the city government, Republican organization, and employes of the city government and the sheriff, who was the chairman of the board of election commissioners; that the election officers in carrying out the purpose of the conspiracy, made false returns of the results of the voting in the precincts of which they were officers; that they did not observe the requirements of the law, with respect to the preparation, issuing, receiving and counting the ballots; that they, with the assent of the voters, who were not illiterate, blind nor physically disabled, showed such voters how to stencil their ballots; that they permitted many voters to stencil their ballots openly and "upon the table;" that they stenciled the ballots of many voters, for them, who were neither blind nor physically disabled; that they accompanied many voters into the booths and assisted them in stenciling their ballots, or else stenciled them for the voters; they permitted voters to expose their ballots, and then received and counted them as valid; they permitted voters to vote more than once; they permitted persons, who were not voters to vote, and persons to vote, who were impersonating legal and registered voters; they assisted others in voting, who had not been sworn, that they were illiterates; that they indicated to other voters, by making a cross mark, dot, dash or line, upon their ballots with a pen or pencil, when such voters were not illiterate and had not taken an oath, that they were such; that they indicated to many voters "by word of mouth or otherwise" the party affiliations of the candidates, and that all such votes were illegal and void, but, were received, certified and counted, as having been received by contestees. The contestants, also charged, that many Democratic officers of the election and challengers were arrested without legal cause and placed in jail; others of them were threatened with arrest and violence and thereby intimidated from properly performing their duties, and voters, who would otherwise have voted for contestants, were

intimidated by these arrests and threats, and thereby caused to refrain from voting; that the Republican officers of the election permitted the workers for contestees, especially the Republican precinct "captains," to remain within the polling places and to go in and out at their pleasure and to indulge in unlawfully instructing the voters, within the polls, how to vote for contestees; that the Republican officers of the election systematically gave out information from the polls to the workers for contestees, on the outside, as to the condition of the balloting and whether certain voters had voted, and thus made themselves partisans of the contestees, rather than impartial election officers; that such officers falsely certified that the contestees, had received more votes at the various precincts than they had actually received, and that contestants had received fewer votes, than they actually received, and thus by the foregoing illegal and fraudulent actions of the Republican election officers, and those acting with them, procured an apparent majority to be returned for contestees, when in fact the majority was in favor of contestants, and they were elected in place of the contestees.

All of the foregoing allegations were denied by contestees, in their answer, and in addition, by way of counterclaim, they pleaded that the contestants did not file their "post election expense statements" with the chairman of the election commission within the time prescribed by law and were therefore ineligible to hold the offices sued for; and, also, that in a great number of precincts the Democratic election officers had made false and incorrect returns, which showed that contestants had received more votes, than they actually had, and that contestees had received fewer votes, than was the fact; and, also, asked for a recount of the ballots in certain precincts. The contestants had, also, prayed for a recount of the ballots.

Before answering, however, the contestees made motions, that the court should require the contestants to make the allegations of their petitions definite and certain by setting out the names of the illegal voters, and votes, who were charged as having voted for contestees and the contestees with having received. These motions were sustained, and the contestants amended their petitions by setting out the names of 144 persons, who had voted illegally for the contestees. This number, if proven, was far insufficient to overcome the majorities

which the contestees had received, as appear from the official returns, as modified by the recount in the 130 precincts. The affirmative allegations of the amended petitions were controverted by orders upon the record.

The circuit court adjudged that none of the contestants were elected, but, set aside the apparent election of the contestees, Stege, Horn, Stone, Kaufman, and Meyers, adjudging that neither of them were elected, because of a failure to receive a majority of the votes cast at the election, and that the offices to which they had received certificates were vacant. From this judgment each of the contestants has appealed, but, the contestees, who were adjudged to have failed of election, have not appealed.

Several large volumes of evidence, are in the record and we have given it a careful consideration. The charge of a conspiracy in behalf of contestees to cause persons, not entitled to vote, but to be registered as legal voters, there is no evidence to support. One Mulligan, a deputy sheriff, appears to have brutally arrested and assaulted a crippled man, who was a Democratic challenger, at the registration and put him in jail, for challenging the registration of certain voters, but, this unlawful act occurred away from the polls, and did not in any way affect the registration.

Without going into detail, there does not appear to be any evidence, or any from which it could be concluded, to support the accusation that the members of the city administration, including the mayor, members of the board of safety and the two Republican members of the board of election commissioners, had conspired with any one to secure the election of the contestees, by any unlawful means. There is no evidence that the police officers interfered improperly with the election, except in two isolated instances, in one of which a Democratic election officer was arrested for refusing to put in the ballot box a ballot, which had been unlawfully stenciled by the clerk for a voter; and, in the other instance, a policeman ordered a Democratic challenger out of the polling place, but, this was evidently done by mistake, as he directly thereafter retracted his action, and permitted the challenger to return to his duties. A subordinate in one of the city government departments, while acting as a challenger, participated in unlawfully stenciling ballots for voters "on the table," and another, without lawful reason, caused a warrant to be issued and a Democratic

election officer arrested and taken out of the polls upon a charge of obstructing the election. These isolated instances of misconduct, of these subordinates, do not sustain a charge of conspiracy between the members of the city administration, or between them and others, but, rather indicate an exception and not the rule. Several Republican election officers were arrested during the day of election, and several Democratic election officers were, also, arrested, but, these arrests, except in the instance above cited, appear to have been made by deputy sheriffs and constables, and in most instances by virtue of warrants, issued by justices of the peace. The charges against these parties were all dismissed by officers representing the Commonwealth, and the merits of the accusations were never developed. The most unwarranted arrests were those of the constables, who served warrants upon Republican election officers, and the arrests of these constables and their incarceration seems to smack of a purpose to intimidate. The numerous arrests, however, do not appear to have affected the result of the election, except in a few instances, some of which will hereafter be adverted to. It is apparent, however, from all the evidence, which relates to the conduct of the election in more than sixty precincts, that in every one of these precincts except one, a similar plan of illegal voting was carried on. There is a similarity in the conduct of the election officers, representing the Republicans, in the manner, in which they received the votes, that very strongly tends to prove the existence of an agreed concert of action among the election officers and precinct workers for contestees to procure all the votes possible for the contestees, either in a legal or illegal manner. This conclusion is borne out by the fact, that in nearly all of these precincts, one of the Republican officers of election or the challenger would immediately inquire if the voter understood or knew how to vote the city ballot, and whether requested or not would proceed to show him, either by pointing a finger to the place where the ballot should be stenciled to vote for the contestees, or by making a cross mark, dot or dash upon the ballot, or else by going into the booth with the voter, or else stencil the ballot for him "upon the table," or else direct the voter to stencil the ballot publicly, and frequently when the voter returned with the ballot, to open and examine it before putting it into the box, and in most instances, when a voter requested assistance, to give it without administering an

oath to him to the effect that he was illiterate, blind or physically disabled. Frequently, when a Democratic challenger or officer insisted upon the voter showing by his oath, that he was entitled to assistance, as being of one of the classes to which assistance may be rendered, the oath administered was not that he could not read, but, was that he did not know or understand the ballot sufficiently to vote it intelligently, or some other form of words, which would make a pretense that the voter had been sworn. Acting under the direction of the chairman of the Republican organization the Republican officers of election, whenever fifty ballots had been voted, at which time the names of the candidates changed upon the ballot, sent information out of the booth of the change to the workers for contestees, which, if not in fact, was a violation of the spirit of the law with regard to the secrecy of the ballot. The uniform failure of the officers of election to make a correct count and certification of the votes, and in nearly every precinct which was recounted, the mistake resulted in certifying a greater number received by contestees than they received, and a less number for contestants than they received, is significant. The evidence chiefly relates to precincts, which from accident, design or necessity are so laid off that there are no Democrats, or very few, in them, and in these precincts the election officers, in most instances, were all Republicans. In some of these precincts where a large number of illegal votes were cast, from the rendering of unlawful assistance to the voters, it is said that the officers of election agreed upon this course, or the Democratic challenger agreed to have the votes cast in that manner, but, it is clear that no agreement among the officers of the election can render valid an invalid vote, as no precinct officers or party representatives would have authority to set aside the Constitution and laws of the country, as all the people have an interest in the purity and validity of the popular elections. At the time of the election in controversy a statute known as the "Non Emblem law," enacted by the 1922 General Assembly, and relating to elections in cities of the first class, was in force, but this statute made no provision for the voting by illiterate, blind or physically disabled persons, and did not directly repeal section 1475, Kentucky Statutes, relating to the manner of voting of such persons, and did not by implication modify any provision of that statute, except probably in one particular. The "Non Emblem law" has now been repealed, and in

view of the conclusions at which we have arrived in this case, it is neither necessary nor profitable to make any construction of that statute or to determine its constitu- tionality, and in determining the votes, which should be deducted from the polls of the various candidates, we have excluded none who would be legal voters under the provisions of section 1475, Kentucky Statutes.

There are certain principles relating to elections and voting at elections, which are too well established for controversy. Among these are the following, viz:

(1) The essential requirements of a valid election is that it shall be free and equal, and that the ballot shall be secret, and the provisions of the statutes, which are necessary to effect those ends are mandatory, but, mere irregularities of election officers and voters, which do not effect the merits of the case, and do not affect the fair- ness and equality of the election or the secrecy of the ballot will not vitiate the election nor affect the validity of a vote.

(2) Where an election officer or other person goes into the booth with a voter and assists him in stenciling the ballot, the vote should be rejected whether or not the voter is an illiterate.

(3) To mark the ballot of a voter with a pen or pencil, or to point out on the ballot, where to stencil it, without the voter having been sworn to the effect that he can not read, or is blind or physically disabled, the ballot should be rejected, although the voter may then go into the booth and stencil it.

(4) If an officer of the election or other person stencils the ballot of a voter, it should be rejected, unless the voter is blind or physically disabled, and has taken an oath to that effect.

(5) A ballot, which a voter stencils openly, as is said "upon the table," should be rejected, although the voter may have taken the illiterate oath.

(6) If a voter is blind or physically disabled, so that he cannot stencil his ballot, and having taken an oath to that effect, then his ballot may be lawfully sten- ciled for him, in the presence of those present.

(7) Voluntary exposure by a voter of his ballot, so that secrecy is destroyed, the vote is invalid and should not be received.

(8) The failure of the clerk to write his name upon the ballot, to remove the secondary stub from the ballot, or the failure of the election officers to take the oath of

office, or to make a return in proper form, does not render the election void, but, these omissions may be received as evidence tending to prove some fraud in the election which might vitiate it.

(9)   If it can reasonably be done, a court should uphold the validity of an election, and not set it aside for light and trival causes, and where there have been fraud, intimidations, bribery, illegalities and irregularities, and the results of such sinister influences can be eliminated, and the result clearly ascertained between the legal voters, it is the duty of the court to do so, and to sustain the election, but, if the fraud, intimidation, bribery, irregularities, and illegalities are such, that the court can not with reasonable certainty determine who has received a majority of the legal votes, the election should be set aside, and a candidate can not be declared a victor, unless he can be shown to have received a majority or plurality of the legal votes cast at the election.   The foregoing doctrines are supported by the following authorities, viz: Felt v. Edwards, 181 Ky. 299; Varney v. Justice, 86 Ky. 596; Muncy v. Duff, 194 Ky. 303; Snowden v. Flannery, 159 Ky. 568; Potter v. Campbell, 159 Ky. 329; Orr v. Kevil, 124 Ky. 720; Lunsford v. Culton, 15 Ky. L. R. 504; Montgomery v. Chelf, 118 Ky. 772; Anderson v. Likens, 104 Ky. 699; Whitney v. Skinner, 194 Ky. 804; Combs v. Combs, 30 Ky. L. R. 161, 873 and 1005; Stewart v. Rose, 24 K. L. R. 1759; Wilkins v. Bell, 114 Ky. 11; Scholl v. Bell, 125 Ky. 750; Harrison v. Stroud, 33 K. L. R. 653; Allen v. Griffiths, 160 Ky. 528; Johnson v. Little, 176 Ky. 509; Frances v Sturgill, 163 Ky. 650; Schoomnaker v. Dunlap, 180 Ky. 835; Hall v. Martin, 183 Ky. 120; Pace v. Reed, 138 Ky. 605; Section 1475, Kentucky Statutes.

In accordance with the above doctrines, wherever the evidence has shown an illegal vote, and for whom it was cast and counted, the vote has been eliminated and subtracted from the votes received by the recipient of it. This process has been followed in precincts which have not been entirely thrown out and disregarded, in the tabulation of votes, but, the election, as held, in thirty-one precincts was so permeated with illegal voting, irregularities of every kind touching an election, unwarranted arrests of election officers, interference in the election by persons having no authority to do so, or to be in the polling places, false and inaccurate returns and the failure of the officers and voters to comply with the

election laws, that it is impossible to ascertain with any reasonable degree of certainty which were the legal votes cast or which the illegal ones, or to eliminate the illegal votes and leave the legal ones with any certainty, and hence we have been constrained to disregard these precincts in the making of any reasonably certain computation of the legal votes cast at the election. It is not meant, that all of the above recited illegalities existed in each precinct, but some of them, in all, and the ones existing in each precinct when combined made necessary its casting out. These precincts are 4, 10, 13, 14, 17, 24, 35, 42, 52 of the 8th ward; 9, 10, 11, 12, 17, 20, 34 and 57 of the 7th ward; 23 and 58 of the 3rd ward; 4 and 8 of the 5th ward; 12, 20, 23, 35 of the 9th ward; and 16, 17, 18, 19 and 23 of the 10th ward. The laws relating to voting by secret ballot having been on the statute books for thirty or more years, it is difficult to conceive that persons acting as officers of election and voters would so persistently, completely violate and disregard these laws, without being moved thereto by an illegal purpose. At this time, in our history, there can be no excuse for such pretended elections and the sooner those who conduct elections become fully aware of this fact, it will redound to their interest, as well as all others.

It is impossible here to set out the evidence bearing upon the elections in all these precincts, but, a short resume of it will be given as to a few. In the 12th precinct of the 9th ward, the Republican "captain" of the precinct came in and directed the clerk, a negro woman, that she should show all the voters how to vote the city ballot, and when a protest was made, he represented that the election commissioners directed that to be done. After that when a voter came in he was asked if he could read and write and understood the city ballot. If he answered that he could read, the clerk then showed him on the ballot the Republican group and where to stencil to vote for them. If he answered that he could not read, the clerk would make a cross mark with a pen in the squares to the left of the Republican groups and tell the voter to stencil there. No voter was sworn that he was illiterate. 45 ballots were found in the box upon the recount which were marked with a cross mark with a pencil or pen to indicate where to stencil. In the 20th precinct of the 9th ward, the voters came in with slips containing the names of the contestees, and presented them to the clerk with a statement that they wanted to

vote for those names. The clerk would make a cross mark, dot or dash with a pen or pencil in the squares to the left of the Republican groups and directed the voter to stencil where the mark was. No one was sworn as to being illiterate, blind or physically disabled. 103 of such ballots were found upon the recount. The election officers were all Republicans.

In the 16th precinct of the 10th ward, the uncontroverted evidence is, that the officers were four Republicans. The ballots were given to the voters unfolded. One of the judges would then take the ballot, and point out on it where to stencil to vote for the contestees. The voter would return from the booth with his ballot unfolded. In only one or two instances was a ballot returned folded. No one of the voters were sworn that he was an illiterate.

At the 17th precinct of the 10th ward, the uncontroverted evidence is that the Republican "captain" of the precinct stayed in the polling place all day and every voter who said that he was intending to vote the Republican ticket, was shown by the "captain" where to stencil to vote it, and if the voter could not read, or said that he could not, the "captain" would go into the booth with him and stencil his ballot or show him where to stencil it. No one was sworn about anything. Several automobile loads of "repeaters" attempted to vote, and the election officers were showing them sample ballots, when they became frightened and went away. When the polls closed, and the Democratic challenger stepped out of the room the door was slammed to and locked, so that the inspector could not get in, leaving the four officers, who were all Republicans, and the Republican "captain" in the room. The Democratic inspector tried to get in and was kept out for fifteen minutes during which time persons looking through a small window saw the officers with the ballot box open and doing some work upon them. The policeman on duty was appealed to and he beat upon the door with his stick, and then telephoned for other policemen. When the machine bringing the additional policemen was within a half square, the "captain" who had come out through a back way, ran to the door and notified the officers and they then opened the door and invited the inspector in. The officers of the election told the inspector with an oath, that they did not have to let him in, "there is the man we are taking our orders from" (referring to the captain).

At the 18th precinct of the 10th ward, every voter, without being sworn that he was an illiterate, was shown on the ballot where to stencil to vote for contestees. There were 181 ballots cast, but only 179 ballots were found in the box on the recount. Fifty of these were stenciled for the contestees, but had never been folded, and were all strung on the string together. Thirty-four were not signed by the clerk. There were only 158 Republican voters registered in the precinct, but the contestees received 180 votes each. Evidently the 50 ballots, which had never been folded were never voted by any voters.

At the 23rd precinct of the 10th ward, nine out of every ten voters either stenciled their ballots "upon the table" or it was done for them by the officer of the election. None of the voters were sworn as to illiteracy or blindness or physical disability.

At the 23rd precinct of the 2nd ward, Weisch was the Democratic judge and Stafford, a Democrat, was clerk. Hester was Republican judge and Alonzo Miller was the Republican challenger and "captain." Things went along quietly for an hour after the polls opened. The workers for contestees then began to instruct the voters to say that they could not read or write. The Democrats insisted on their being sworn that they were illiterate, but Miller and Hester insisted that they should be permitted to stencil their ballots "on the table," and took the stencil from the booth and would either stencil the ballot themselves or have the voter to do it, there in their presence "on the table," and this continued until thirty or forty ballots were voted in that way. Weisch and Stafford continued to object, and Miller struck and knocked Stafford down. Mulligan a deputy sheriff came and arrested Weisch and Stafford and took them at once to jail, where they were searched, given a cold bath and locked up. As soon as they were gone, two Republicans, one of whom was a rum runner and did not reside in the precinct, were installed in the place of Weisch and Stafford, and the Democrats had no representatives in the polls. Weisch and Stafford gave bonds and got out of jail and returned to the polling place, but the sheriff would not permit them to come into the room. Lautz, a Democratic district manager, came and inquired for Weisch, when Hester, the sheriff answered that he did not know such a man. Lautz looked in the door, and saw them stenciling a ballot on the table.

Mulligan, the deputy sheriff, came and Miller directed him to arrest Lautz on a charge of obstructing the election, which he did without a warrant, and took him to jail. Squire Vogt was in the jail and issued a warrant for Lautz at Mulligan's direction, and Lautz was given a cold bath and locked up. Stafford and Weisch kept memorandums of the names of the voters, who were voted upon the table, but when Stafford was arrested, he left the memorandum and could get it no more. Weisch's memorandum was taken from him at the jail.

At the 8th precinct of the 5th ward, Abe Ragowski, the Republican "captain" of the precinct, stayed in the polling place, and stenciled the ballots, practically, of four-fifths of the voters, or else they stenciled the ballots "upon the table" openly under the immediate direction of Ragowski. Some one procured a warrant for Ragowski and had him arrested, but he returned and continued to stencil the ballots for the voters. While away he procured a warrant for Barker, the Democratic challenger, and Mulligan, the deputy sheriff, came and arrested him, carried him to jail, where he was given a cold bath and locked up. While Barker was absent from the polls Stengel was appointed challenger for the Democrats in his place, but Mulligan returned, and threatened Stengel that he would break his head, if he did not leave the polls. Stengel stood about fifty feet away when a negro came up behind him and knocked him in the head with a pistol. A young girl impersonated and voted in the name of an old woman, who was in the asylum for the insane. One man voted twelve times, under the name of various registered voters.

At the 10th precinct of the 5th ward, out of 115 voters, the clerk marked the ballots of 105 of them, so as to show them where to stamp with the stencil. The Democratic challenger insisted that the voters should not be given assistance, unless they were illiterates and were sworn to that effect. The clerk would then administer the following oath: "Do you know this ballot well enough to vote it intelligently?" The ballots were handed to the voters without being folded and they returned them unfolded.

At the 57th precinct of the 7th ward the Republican sheriff went into the booth with fifty voters and stenciled the ballots for the voters, and five or six voters stenciled their ballots "on the table." Many of the voters, before going into the booth, had the clerk to mark

their ballots, without being sworn as to being illiterates. One of the officers would examine a ballot before putting it in the box, and if it was not stenciled to suit him, he would call the voter back and have him to stencil it, or else would do so himself. The officers refused to count the votes but certified that the contestees had received 160 votes each and the contestants none.

In the 11th precinct of the 8th ward there were 156 registered voters. When the election was held, out of 71 votes cast while the Democratic challenger was present, all but five of these ballots were stenciled for the voters by the Republican sheriff, judge or challenger. The Democratic challenger objected to this manner of voting and caused these officers to be arrested. While they were gone Long, the Republican "captain," came into the polling place and proceeded to act as clerk. The Democratic challenger was then arrested, upon a charge of obstructing the election, because he objected to that manner of voting. He was given a cold bath and locked in jail. When he returned to the polling place, the Republican "captain" had the ballots out and was busily writing upon them, but desisted when the challenger came into the room. Every one was shown how to vote the ballot without being sworn that he was an illiterate, while the Democratic challenger was absent. When the polls closed, there were 189 ballots in the box, and the officers burned 33 of them so as to reduce the number to the number of registered voters in the precinct. The names of voters were written on the primary stubs of only 135 ballots, and on a large number of ballots, the secondary stubs were not detached.

The evidence relating to the conduct of the election in the other precincts thrown out is similar in character as to illegal voting to the foregoing and in some instances other illegalities in addition to the foregoing and each of the precincts presents illegalities of a character equally as fatal to the validity of the election. A precinct is the unit of a general election and may be disregarded and cast out, when the election in it is so vitiated as to make it impossible to determine which are the legal and which the illegal votes and their number and for whom cast, as there may be other precincts in which a valid election is held and from which according to the circumstances, the election in the district may be held valid. The best conclusion at which we can arrive, based on the evidence, from fifty to seventy-five per centum of the votes cast in

the 31 precincts thrown out were illegal votes, and there were cast in these precincts from 4,500 to 5,000 votes. Besides there was evidence, which proves that at several other precincts, which were not recounted, and where there was nothing in the record from which it could be ascertained the number of votes cast or for whom, that the same system of illegal voting was practiced and in the same manner.

When the votes received by the contestees in the 31 precincts cast out, are added to the illegal votes received by them as proven, in the other precincts, they make a number, which, when deducted from the votes received by them according to the official returns, as modified by the recount, sweeps away the apparent majorities they received, and leaves each of them with a minority of the votes, except the appellee, Dan Carrell, who has yet a majority of 91 votes over any of the contestants for the office of park commissioner. Having deducted from Carrell's poll all the illegal votes shown, and the votes received by him in the precincts cast out, and there remaining a majority in his favor, demonstrates that he received a majority of the legal votes and was elected. Each of the other contestees has an apparent minority of the legal votes and was therefore not elected. To ascertain the above results the votes received by the contestants in the precincts thrown out, were added to the illegal votes proven to have been received by them in the other precincts, and the combined sums deducted from the aggregate of votes received by them upon the official returns as modified by the recount. To set out herein a statement of all the votes received by each of the 78 candidates after the above deduction would unnecessarily extend this opinion.

Neither of the contestants was elected because neither did or could demonstrate with reasonable certainty that he had received a majority of the legal votes. The official returns are presumed to be correct, and if one would overturn them, he must show with reasonable certainty that he was elected. The casting out of the precincts is not a holding that there were no legal votes cast in them, but that it was impossible to separate them from the illegal, and without a total disregard of the votes in these precincts, the contestants would not have any majority. It follows as a natural result that there is no way of ascertaining with any reasonable certainty, as to who was elected as between the contestants and con-

testees, with the exception of Carrell.  As to the appellees, Carrell, Stege, Horn, Stone, Kaufman and Meyer, the judgment is affirmed, but, as to the appellees, Heyburn, Johnson, McCandless, Hawes, Volz, Towle, Miller, Morton, Schoppenhorst, Will, Ratterman, Fernow, Sanders, Lutz, Denzer, Watson, Petty, Isaacs, Lindley, Carder, Lauder, Baird, Warren, Koch, Jones, Payton, Fehler, Ohmann, Awtry, Sloan, Heatkenmeier, Sr., Sikking and Brown, the judgment is reversed and remanded with directions to declare the office held by each of the last mentioned 33 contestees to be vacant, and for other proceedings consistent with this opinion.

Whole court sitting except Judges Dietzman and McCandless, whose places were filled by special judges, Rollin Hurt and John D. Carroll.