## Hill, et al. v. Mottley, et al.

### (Decided February 21, 1911.)

### Appeal from Warren Circuit Court.

1. Local Option Election—Cities of Third Class—Manner of Holding —Election in Entire County.—Where a city of the third class petitions for a local option election to be held on the same day that an election for the entire county is ordered to be held, it is proper to provide for and hold the election in the city with separate officers, separate ballots, separate boxes and separate polling places.

2. Illiterate Voters—Necessity for Oath.—The provision of section 1475, Kentucky Statutes, with reference to the oath required of the illiterate voters is mandatory, and where the voter indicates how he desires to vote without first being sworn, the clerk has no right to dot the ballot and a ballot so cast is illegal.

3. Evidence.—The ballots so dotted are the best evidence of the number of ballots and how the votes were cast.

4. Contested Election.—Evidence of a contested local option election examined and held that the proof of fraud, bribery and intimidation was insufficient to leave the mind in doubt as to the result, but that after deducting all purchased and illegal votes there was a clear majority in favor of the side represented by the contestees.

BRADBURN & BASHAM and B. F. PROCTER for appellants.

T. W. & R. C. P. THOMAS, SIMS & RODES and GRIDER & HARLIN for appellees.

OPINION OF THE COURT BY WM. ROGERS CLAY, COMMISSIONER—Affirming.

This appeal involves the validity of a local option election held in Bowling Green, a city of the third class, on June 28th, 1910. The result was 1,109 votes in favor of the sale of spirituous, vinous and malt liquors in said city, and 1,027 votes against such sale, or a majority of 82 votes in favor of the sale. The election was contested, and the contest board for Warren county sustained the election. An appeal was then taken to the Warren circuit court, and there the election was again sustained. From the judgment entered in that court the contestants appeal.

The grounds of contest are: (1) That the election was void on account of the manner in which it was conducted; (2) that there was a sufficient number of illegal votes cast to overcome the majority in favor of the sale of spirituous, vinous and malt liquors; and (3) that there were such bribery, fraud and irregularities as to nullify the election.

These grounds will be considered in the order named:

1. Was the election void on account of the manner in which it was held?

On April 13th, 1910, there was lodged with the judge of the Warren county court, and filed in the office of the clerk thereof, a petition signed by the requisite number of legal voters of each precinct in Warren county, requesting the court to order a poll to be opened at all the voting precincts in said county on the 14th day of June, 1910, to take the sense of said voters on the proposition whether or not spirituous, vinous and malt liquors should be sold, bartered or loaned in said county. On April 29th, and before any action was taken upon the petition

referred to, a petition, signed by the requisite number of legal voters in each precinct in the city of Bowling Green, was filed praying the court to order a poll to be opened in all the voting precincts in said city, to take the sense of the legal voters thereof upon the proposition whether or not spirituous, vinous and malt liquors should be sold in said city. The petition asked that the election be ordered to be held on the same day as that ordered to be held for Warren county. On May 9th, 1910, the court entered an order directing that an election be held on June 28th, 1910, for Warren county, and that upon the same day and the same time a separate election should be held in the city of Bowling Green. The court first ordered that the two elections be held by the same officers, but upon separate ballots which were to be placed in separate boxes and counted separately. Subsequently, upon application by representatives of each side, the court modified his original order, and directed that the election in the city be held in separate booths and by other officers than those who conducted the election for the county. The polling places for the county and for the city in each precinct were placed near each other. In this manner the election was held with the result above indicated.

It is earnestly insisted that this method of conducting the election was contrary to the mandatory provisions of the statute, and that, therefore, the election is void. Section 2560 of the Kentucky Statutes provides in part as follows:

"No election in any town, city, district or precinct of a county shall be held, under this article, on the same day on which an election for the entire county is held, except that cities of the first, second, third and fourth classes may hold an election on the same day on which an election for the entire county is held."

The other part of the statute has no bearing upon the question under consideration. It will be observed that there is nothing in the statute directing how an election in a city of one of the specified classes shall be conducted. The statute simply authorizes such an election to be held on the same day on which an election for the entire county is held. It does not prescribe that such an election shall be held in the same voting places, or by the same officers or upon the same ballot. That being true, it can not be said that one method or another violates

the mandatory provisions of the statute. As the city of
Bowling Green is a part of Warren county, the citizens
of that city had a right to vote upon the question of pro-
hibition, not only as affecting the city, but as affecting
the entire county. No confusion resulted from their not
understanding whether they were voting upon the pro-
position as it affected the entire county or as it affected
only the city. The question upon the ballots for the
separate election held in the city was in the following
form:

"Are you in favor of prohibiting by law the sale,
barter or loan of spirituous, vinous or malt liquors with-
in the city of Bowling Green, said prohibition to apply
to druggists?"

By submitting the question in this form, the voters
of the city understood exactly the question upon which
they were voting. We, therefore, conclude that the man-
ner of conducting the election was proper.

2. Was there a sufficient number of illegal votes cast
to overcome the majority in favor of the sale of spirit-
uous, vinous and malt liquors?

There was no proof to the effect that a number of
persons in three precincts stated that they were unable
to vote without being instructed, and thereupon the clerk,
or some other officer, placed a dot with a pen or pencil
in the square where the voter indicated his purpose to
vote. None of these voters were sworn. Section 1475
of the Kentucky Statutes provides:

"Any elector who declares, on oath, that, by reason
of inability to read the English language, he is unable
to mark his ballot, may declare his choice of candidates
or party ticket to the clerk, who, in the presence of the
judges, sheriff and challengers and the elector, shall,
with his pencil, mark a dot in the appropriate place for
the cross-mark, to indicate the choice of the elector. The
clerk shall then fold and deliver the ballot to the elector,
and instruct him to retire to the booth and there mark
his ballot by making a cross-mark either in the squares
showing dots or any other squares he may desire. In all
other respects he shall vote as is required of other elec-
tors. In case any person applying to vote is blind, and
shall so declare on oath, the clerk shall be allowed to
mark his ballot for him in the presence of the other of-
ficers of election, and the challengers allowed by law; or,
in case any person shall be so physically disabled as to

be unable to mark his ballot, and shall so declare, on oath, the clerk shall have the right to mark his ballot as in the case of a blind person applying to vote. Any one making a false declaration under this provision of this section shall, upon conviction, be fined in any sum not exceeding fifty dollars, and be disfranchised for a period of two years; and any clerk who shall willfully deceive any elector in marking any ballot, or willfully mark the same in any other way than as requested by said elector, shall be guilty of felony, and, upon conviction, shall be imprisoned in the penitentiary for not less than two nor more than five years.''

It is manifest that the votes so marked were cast in violation of the mandatory provisions of the above statute. The circuit judge, therefore, properly held that all such votes were illegal. To arrive at the number of such votes, the trial judge examined the ballots himself, not only with his naked eye, but under a magnifying glass. Wherever he found that a ballot indicated that it had been marked in the manner pointed out, he rejected it as illegal. There are 63 such ballots. Of these, 55 were voted ''wet,'' while 8 were voted ''dry.'' It is not insisted that the trial judge made any mistake in his figures; but it is earnestly argued that the oral testimony shows that a much larger number of persons than the ballots indicated voted in the same manner. The witnesses, who testified, stated that there must have been from 50 to 125 such ballots. It is manifest, however, that such evidence was mere guess-work. For this reason the trial judge rejected such evidence, and properly held that the only reliable method for arriving at the true situation was to examine the ballots.

The trial court also found that, in the Electric Light House Precinct, one voter voted on the table without being sworn, and voted ''wet,'' while in the same precinct seven voters voted on the table without being sworn, and voted ''dry.'' He also found that, in Kister's Mill Precinct, one voter voted on the table without being sworn, and voted ''wet,'' while three voters voted ''dry'' in the same manner. He further found that, in the Police Court Room Precinct, there were two ''dry'' votes which were cast in the manner set out above. Thus, of this character of votes, two were ''wet'' and twelve ''dry.'' The trial judge properly held that none of these votes should be counted, and made proper deductions

therefor. It is not contended, nor does it appear, that he made any mistake in his figures.

The trial court also deducted from the "wet" side the votes of nineteen negroes who were paid money, either on the day of the election or the day after. Several of these negroes testified that they were employed a few days before the election to work for the "wet" side, and that they were paid for their services and not for their votes. While there may be some doubt as to whether all these votes should have been excluded, we shall not disturb the finding of the lower court upon this question.

The record also shows that five persons, who were not entitled to vote, voted "wet." These votes were properly excluded, and there is no contention that the lower court's figures in this regard are incorrect.

In deducting the nineteen purchased votes, the trial court was in doubt as to whether all should be deducted, for the reason that they might have been included in the list of those whose ballots had been improperly dotted. However, he gave the contestants the benefit of the doubt, and no complaint arises on this score.

After deducting all the illegal votes on each side and giving the contestants the benefit of every doubt, the trial judge held that there was still a majority of fourteen votes in favor of the sale of spirituous, vinous and malt liquors in the city of Bowling Green. Upon a careful consideration of the whole record, we see no reason for disturbing his finding either of law or facts.

3. Were there such bribery, fraud and irregularities as to nullify the election?

Under this head it is complained that the "wets" had a bonding syndicate that went on the bonds of the negroes who had been arrested. The negroes arrested certainly had the right to give bond, and the persons who went on their bonds had the right to do so. The fact that a number of persons on the "wet" side went on such bonds is not evidence of fraud or bribery.

As a further evidence of fraud and corruption, we are cited to the fact that the "wet" side procured certificates from the county clerk and paid the fee therefor, for persons who had lost their certificates. This practice, however, was not confined to the "wet" side; those on the "dry" side did the same thing. The fact that this was done can not be considered as evidence of fraud

and bribery, in the absence of other evidence tending to show that the practice was corruptly engaged in.

Much stress is laid upon the fact that, on the night before the election, a large crowd of negroes gathered at the "wet" headquarters, where speeches were made to them and they were given beer and lunch; and that on the day of the election these same negroes marched to the polls under the escort of certain leading business men of the city. The "dry" side, however, also held meetings, where speeches were made and lunches were served; and friends of that side went to the polls in large numbers. Fraud and bribery can not be presumed from such facts.

It is also insisted that, in one of the precincts, it was ascertained that, when ballot No. 244 was reached, the number was 344, instead of 244; that as the ballots were prepared by a newspaper in favor of the "wet" side, this should be construed as an evidence of fraud. It appears that the clerk changed the figures on the primary and secondary stubs from 3 to 2. It is, therefore, insisted that this was a part of the plan to impress the illiterate voter, whose vote had been purchased, that his vote was being marked so as to indicate whether or not he voted as he agreed to vote. Why the voter should reach this conclusion from the changing of the figures any more than from the fact that the clerk wrote the voter's name on the stub or his own name on the ballot, we are unable to see. The mere statement of appellants' proposition shows that the inference they would have us draw from the facts is too strained to justify us in assuming that the mistake in the numbers upon the stubs of the ballots was a part of a plan to carry the election by fraud.

It is also insisted that there was improper conduct on the part of certain officers conducting the election. In this connection we are referred to the fact that there was evidence tending to show that certain challengers and other officers stated to voters, as they came in to vote, that they were "good fellows," they knew how to vote "wet." Conceding that this practice was indulged in, it can not be contended that either the voter to whom such an improper remark was addressed, or all the voters of the entire city, should be disfranchised for such misconduct. To do so, would be to make an election depend, not upon the result as indicated by the ballot, but upon the propriety or impropriety of remarks made by the officers conducting the election.

Under this head it is further contended that contestants could have shown that more than nineteen voters were bribed had it not been for the action of contestees and their attorneys in meeting and talking to witnesses summoned by contestants. We have carefully considered the evidence upon this point, and it utterly fails to show that contestees or their attorneys used, or attempted to use any corrupt or unlawful means to prevent contestants' witnesses from testifying. There is no law forbidding an attorney from talking to the witnesses of the opposing party, and so long as the evidence fails to show that, in doing so, he acted corruptly, no presumption can arise that the opposing party would have produced proof of additional fraud had it not been for such conduct on the part of the attorneys.

There was some evidence tending to show that certain negro voters, upon going into the booths, held their ballots above their heads; and it is insisted that this was done for the purpose of showing the "wet" workers on the outside how they had voted. The trial judge found that this charge was not sustained by the weight of the evidence, and, upon a careful consideration of all the evidence upon this point, we see no reason to disturb his finding.

Witnesses were introduced who testified to the fact that "wet" workers were engaged in carrying voters to and from the polls in automobiles and carriages. Two or three witnesses testified to seeing one person give another person some money. Other witnesses testified that, in different parts of the town, they saw a man in a buggy or carriage hand something to another man. The carrying of voters to and from the polls in vehicles is a practice that has always been indulged in, and is not subject to criticism. The fact that a witness sees one person hand something to another, without showing that the other is a voter, can not be considered as evidence of bribery.

Much stress is laid upon the testimony of an employee for a furniture establishment, which furnished certain chairs to be used at the "wet" headquarters. He claims that he went to the "wet" headquarters on the day after the election, and there saw 200 or 300 negroes. He asked two or three of them what they were doing there; whereupon they replied that they were there to get the money for what they had done in the election. One of these negroes afterwards testified that he received $7.00 for his

services. While the porter was there, he claims a man came to the door and said, "I am now ready for the Gas House Precinct." From these facts we are asked to infer that all the negroes present had been bribed, and that the man who made the alleged remark was ready to settle next with the voters who were purchased in the Gas House Precinct. The weakness in this argument consists in the fact that the remark made by the two or three negroes with whom the porter talked, as to what they were doing there, can not be construed as binding on all the others present and as evidence of the fact that the others were there for the same purpose. Furthermore, the remark attributed to the two or three negroes did not show that they were there to receive money for their votes, but for what they had done in the election. The two or three negroes referred to may have performed legitimate services for which they were entitled to compensation. Nor can we assume from the remark made by the white man, who came to the door, that he meant that he was ready to pay the negroes in the Gas House Precinct for their votes which they had cast on the day of the election.

The record shows, and the trial judge found, that a majority of the negro voters were on the "wet" side. We are not to indulge in the presumption that they were bribed to espouse that side. Fraud and bribery are never presumed; they must be established by proof. To do this, direct evidence is not always necessary; fraud and bribery may be proved by circumstances. In the latter case the circumstances must be such that the inference of fraud or bribery naturally follows from the facts so proved. Facts that tend to create only a suspicion, strained inference, or mere conjecture, are not sufficient. Appellants have proceeded upon the theory that all the negroes were bought. They then interpret everything that took place on the day of election or the next day in the light of that theory. Such is not a correct method of reasoning. On the contrary, the various irregularities alleged must be considered singly and together; and when so considered the question is: Were they sufficient to show so much fraud, bribery, intimidation and violence as to leave the mind in doubt as to the result of the election? It is not sufficient to show that the election might have been affected by fraud; it must affirmatively appear that it was so affected. The evidence for appellants does not measure up to this standard. Here, then, we have a

case where the election was properly held and the result properly certified. There is no proof of intimidation or violence. After deducting all the votes which there is any evidence to show were purchased, and all the votes shown by competent proof to have been illegally cast, although the former may be included in the latter, and thus giving to the contestants the benefit of every doubt, there still remains a majority in favor of the side represented by the contestees. While this court will not hesitate to declare invalid an election where there is sufficient proof of fraud or bribery to leave the mind in doubt as to the result, it is committed to the doctrine that elections are not to be set aside for slight or trivial causes. To set aside this election would be to disregard this salutary rule, and would tend to destroy that confidence in elections which is absolutely essential to a full and fair expression of the popular will. (Mottley v. Wilson, 26 Ky. Law Rep. 1011; Skain v. Millward, 138 Ky. 200.)

Recognizing this rule, the trial judge held the election valid. A careful reading of the entire record convinces us of the soundness of his conclusion.

Judgment affirmed.

Whole court sitting.