## Alsip v. Perkins.

(Decided October 3, 1930.)

(Rehearing Denied December 16, 1930.)

6

J. B. JOHNSON, L. O. SILER and TYE, SILER, GILLIS & SILER for appellant.

B. B. SNYDER, C. S. WILSON and JAMES M. GILBERT for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

John Alsip and R. H. Perkins were opposing candidates for the office of member of the board of education in Whitley county at the November election, 1929. As counted by the election officers Alsip received 541 votes and Perkins 540. Alsip received the certificate and Perkins filed a contest. On his motion the circuit court recounted the ballots, but the recount made no change in the result. On final submission of the case the circuit court threw out the vote of Bacon creek precinct on the ground that the election in this precinct was not conducted by secret ballot. Alsip had received about two-thirds of the votes in this precinct and the throwing out of the precinct gave Perkins a majority. The circuit court adjudged Perkins elected. Alsip appeals.

While there is some conflict of testimony, the real facts as to this precinct, as shown by the testimony, are these: The election was held in a schoolhouse. The building was thirty-seven feet long and twenty-three feet wide. At the entrance to the room there were two cloak-rooms four feet wide with a hallway between, leaving the schoolroom thirty-three feet long and twenty-three feet wide. The stove sat near the center of the building. The officers placed a small table just back of it on which the clerk made out the stubs. He sat just back of the table so that he could write on the table, with his face to the door. The other officers sat near the stove and further from the back, although at times they changed their position and were in different places in the room. The voters came in at the door, came up to the clerk's table and got their ballots there, then went to the two

back corners of the room and stamped their ballots on the back of a school desk. From the clerk's table to the left hand corner, where most of the voters voted, it was twelve and one-half feet, and from his table to the other corner, where the rest voted, was fourteen feet. The clerk's chair was about ten and one-half feet from the left corner. There were eight windows in the building, all on the left side. One of these windows was opposite the desk on which the ballots were stamped. There was a shade on the window. The sheriff pulled it down, but during the day different persons who wanted more light, put it up and a large part of the time it was up. There were no curtains of any kind where the voting was done. The officers in the room could see the voter back there voting his ballot. There is much testimony in the record that, if they had looked, they could have known how the voter stamped his ballot.

On the other hand, the undisputed proof in the record is that the ballot was four inches wide and seven inches long; it had but two names on it, those of Perkins and Alsip, and they were printed less than an inch apart. A copy of the ballot is filed with the record. It is also undisputed that at the back of the school desk there was a projection two or three inches high, and this would obstruct a view of the ballot when placed on the desk, unless the person was very close. While there is some evidence that a person could see how a ballot was voted, there is no evidence that any one did see, and the weight of the evidence is to the effect that any one standing as far off as ten feet could not tell by looking at the voter at what point on the ballot he was putting this stamp. It is clear from the evidence that nobody did make an effort to look and clearly no one could have seen unless he made a very special effort to observe, and even then it would have been hardly more than a guess.

Some of the witnesses testified that a person standing outside of the window, when the shade was up, could see how a person stamped his ballot on the inside, but there was no evidence that anybody stood out there, and, as the light was on the outside, and the only way to see was to look through the glass of the window, it is clear that the person to see would have to get right up against the window; witnesses who made the experiment so testified, and there is absolutely no evidence that anybody was back there looking through the window at any time. The officers of the election and everybody else who tes-

tified state that the election was quiet and orderly; there was no disturbance of any kind, and nothing was said about the absence of curtains. The sheriff had simply failed to furnish curtains for the booths. The election was held just as the primary in August was held and just as the previous general election. The persons voting in one corner of the room were about seventeen feet from the persons voting in the other corner. The clerk had his back toward the voter and the voter in stamping his ballot at the window would have his left side to the clerk, and if he used his right hand, as most persons do, he would stamp his ballot with the right hand, or on the opposite side from the clerk. None of the election officers paid any attention to the voters after they went back to the voting places. Two voters testified that they did not go back to the corner and voted nearer to the clerk than above stated, but nobody observed this at the time, and nobody saw the ballot.

Smith v. Jones, 221 Ky. 546, 299 S. W. 170, 171, is relied on to sustain the judgment below; but that case was entirely different from this. The facts there and the reason for the conclusion of the court are thus stated in the opinion:

"In this precinct there were 146 votes cast, 99 for Smith and 47 for Jones—a majority of 52 for Smith. The proof shows that at least 35 of the 146 votes were cast openly on the table without being sworn. This is more than 20 per cent. of the total vote in the precinct, and it has often been held that, where as much as 20 per cent. of the total vote has been illegally cast, and it is impossible to determine the result of the legal vote between the contending candidates, the precinct should be thrown out. Harrison v. Stroud, 129 Ky. 193, 110 S. W. 828, 33 Ky. Law Rep. 653, 16 Ann. Cas. 1050; Manning v. Lewis, 200 Ky. 732, 255 S. W. 513; Marilla v. Ratterman, 209 Ky. 419, 273 S. W. 69. In addition to this it appears that the election was held in a room 12x15 feet; that the officers of the election occupied a table in one end of the room and three boxes were placed side by side along the 12-foot end of the building. There were no curtains of any kind; the voters would stamp their ballots on these boxes, and were necessarily standing practically shoulder to shoulder, so that each could see what the other did, and

anybody in the room could also see, as there was no screen or obstruction of any sort. To sustain such an election would be to give no force to the constitutional provision that all elections by the people shall be by secret official ballot.''

There is no such proof in this case. On the contrary the proof is very like that in Jones v. Steele, 210 Ky. 205, 275 S. W. 790, 791, where the court thus stated the rule:

''It is true that the person of the voter could be seen, and his movements in manipulating his stencil and ballot could be seen by other voters or persons in the room. The secrecy of the ballot is not so essential as to the person of the voter as it is with respect to the casting of his vote; that is, who he is voting for. It is undoubtedly true that it would have been much better to have had booths and curtains in accordance with the directions of the statute on the subject, and this should be done, but to say that these 340 odd voters of this county and precinct should be deprived in their choice in the selection of the nominee for jailer because of a failure to provide them with the booth and curtain, or other means of secrecy directed by the statute, is further than this court is willing to go.''

Then after pointing out that certain witnesses testified that a person could see how a ballot was voted, the court said:

''On this question as to whether voters could be seen to detect how they were voting, the court is of the opinion that the situation was such as satisfied the minds of the officers of the election and the voters who have testified here on this subject that they could cast their ballots there in that large room without being overseen by any person in the act of stamping their ballot without the use of booths or curtains.''

In Eversole v. Craft, 216 Ky. 500, 287 S. W. 965, 967, the facts were thus stated by the court:

''One witness testifies that he could have seen how a certain man and woman voted if he had tried, but does not profess to have done so, while the great preponderance of the evidence, including that of

each of the election officers, is to the effect that the election was in all essential respects secret, and that the voters were concealed when they were in the booths, except that the outside curtain did not hide the lower part of the body. But it is said that great crowds gathered around the outside door of this building, and that there was no rope or barrier which required them to stay the statutory distance from the polls.''

On these facts the court held:

''Our statutes designed to carry into effect the constitutional requirement for the secrecy of election, in so far as they prescribe the means and methods of carrying that constitutional provision into effect, are only directory although the end designed to be accomplished is itself mandatory. So, even if certain statutory requirements as to the conduct of an election are not complied with, if the essential thing of secrecy of the ballot is effectually brought about, such statutory requirements are always held to be only directory, and not mandatory. Muncy v. Duff, 194 Ky. 303, 239 S. W. 49; Hardy v. Russell, 181 Ky. 299, 204 S. W. 145; Varney v. Justice, 86 Ky. 596 6 S. W. 457, 9 Ky. Law Rep. 743.''

The rule is well settled that, if it can reasonably be done, the court should uphold the validity of an election and should not throw out a precinct on doubtful evidence. Marilla v. Ratterman, 209 Ky. 409, 273 S. W. 69, and cases cited. Section 147 of the state Constitution provides: ''All elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited.''

But by section 155 of the Constitution school elections are excepted from the operation of section 147. The election here was held under section 4399a-1c, Kentucky Statutes, which provides that such an election ''shall be by secret and separate ballot.'' Under the clear weight of the evidence here this election was held by secret separate ballot; although the sheriff had failed to furnish curtains for the booths as should have been done. Although the provisions of the statute as to booths were not complied with, yet as the secrecy of the ballot was not affected thereby, the election will not be avoided because of such failure to follow the statute.

It is earnestly insisted that the rule of the court is that the finding of the circuit judge will not be disturbed on the facts where the mind is left in doubt as to the truth. But this rule has no application where the mind is not left in doubt. Where the real facts are apparent, this court will not shut its eyes to the truth.

The above disposes of the case as determined by the circuit court. Perkins took some proof as to illegal votes cast at the election. But he did not show that these persons voted for Alsip. He had a subpoena issued for them, but they did not appear. The bare fact that they had not appeared in answer to the subpoena is not sufficient to show how they voted, although there is some testimony that they were friends of Alsip. On the other hand, Alsip attacked a number of votes which he showed were cast for Perkins and were illegal; but it is unnecessary to go into this matter, as this would only increase Alsip's majority.

Judgment reversed, and cause remanded for a judgment dismissing the petition.