## Revis v. Duff et al.
(Decided Nov. 29, 1938.)

W. H. LEWIS and J. H. ASHER for appellant.

SCOTT E. DUFF, JESSE MORGAN and W. C. EVERSOLE for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

This is the third installment of the 1937 Leslie county sheriff's race before this Court. Appellant, G. W. Revis, was the successful candidate in the Republican primary for sheriff of Leslie county in 1937. One of the defeated candidates in that race, I. M. Wooton, sought to have his name placed upon the ballot in the regular election as an Independent candidate for sheriff. Appellant challenged his right to do this, and in the case of Keen, County Clerk v. Revis, 270 Ky. 223, 109 S. W. (2d) 609, we held that, under section 1550-5a of the statutes, Wooton had no such right. Seventeen days before the 1937 November election, appellee, C. B. Duff, and Sim Morris filed with the county clerk petitions of nomination for sheriff of Leslie county as Independent candidates. Appellant, Revis, filed an action to enjoin the county clerk from causing the names of Duff and Morris to be printed on the ballots as Independent candidates for sheriff on the ground that their petitions were not filed in time. This action reached us in due time, and in the case of Revis v. Keen, Clerk, 270 Ky. 327, 109 S. W. (2d) 797, we held that the petitions of appellee and Morris had been filed in time. In that opinion it was pointed out that each petition was signed by the number of electors required by section 1453 of the Statutes. For some reason, only the name of appellee, Duff, was printed on the ballot for the regular election as an Independent candidate for sheriff. The final vote after a recount had been had in some of the 26 precincts in Leslie county showed 1,900 votes for appellee and 1,759 votes for appellant. A certificate of election was issued Duff.

Appellant filed a petition contesting appellee's election. In his petition he alleged that (1) Duff had violated the Corrupt Practice Act, Kentucky Statutes, sec. 1565b-1 et seq., (2) there was illegal voting in various precincts throughout the county, and (3) that Duff's name did not lawfully or legally appear on the ballot because his nominating petition was defective. As is usual in such cases, a large record consisting of some 650 pages of pleading and proof was made up. At the March term, 1938, the trial court entered judgment dismissing appellant's petition and grounds of contest against Duff. From this judgment Revis appeals.

Reversal is urged by appellant on the following grounds:

"1. That appellee was guilty of violating the 'Corrupt Practice' Act in securing his election;

"2. That a sufficient number of voters, who voted for appellee, cast their votes openly on the table in the presence of the officers of the election and other persons without being sworn as to their inability to make their own ballots, and were therefore void and should not be counted for appellee;

"3. That Hyden Precinct No. 1 should be thrown out and the vote cast for both parties be disregarded, because, in said precinct the 'secret ballot' was not observed. All voters who cast their ballots in said precinct were required to and did vote in a small room in the presence of each other and many saw each other's ballots before and after they were cast;

"4. That appellee's nominating petition did not contain the names of 100 legal signers. Some 40 names of electors having the nominating petition of other candidates for the same office;

"5. That the trial court did not decide the case upon the pleadings and proof, but disregarded the pleadings and rendered his judgment on proof not sustained by the pleadings."

A mass of proof was taken on the question as to whether or not the Corrupt Practice Act was violated. Appellee and his witnesses denied flatly the charges made by a number of appellant's witnesses to the effect that money was used in the election with which to buy votes; admitting, however, that, following a long established custom in Leslie county, some ginger bread was bought and passed out to the voters at a few voting places. While appellant's petition alleges irregularities and the use of money in a number of precincts, he names only 10 voters in the Marrowbone and Howard precincts, whose votes were supposed to have been bought by Shelby Bailey for appellee. Shelby Bailey testified that he bought votes for Duff with money given him by Carl Farmer, one of Duff's men. He stated that Farmer brought him 10 half dollars in a paper poke the morning of the election, and that during the day he got four more half dollars from Farmer. Appellee testified that he did not know Bailey, and that he had never seen him until the time he gave his deposition in this case

Duff stated further that he did not give him, or send him, or anyone else, money in the election. He said that he believed that he received only 10 votes in the Howard precinct. In the case of Lewis v. Sizemore, 274 Ky. 58, 118 S. W. (2d) 133, we had occasion to review testimony given by Bailey in a 1937 county school board election contest. In that case Bailey testified that he saw one of the school board candidates give Alisee Coldwell some money. Alisee Coldwell, who testified in that case that Bailey gave her a dollar to vote in the sheriff's race, is one of the 10 persons named by appellant as having been paid by Bailey to vote for Duff. In the Sizemore Case it was pointed out that the reputation of Bailey and Alisee Coldwell, was established as bad.

While appellee seems to have manifested little interest in his race for sheriff, it appears that one of his brothers, along with I. M. Wooton and others, was active in his behalf. Appellant and his friends waged a rather vigorous campaign also. The supporters of each candidate met in Hyden a day or two before the election. Theo Brock testified that appellee gave him $5 to do what he could for him in the election. Duff denies this, however, and he and another witness testified that, at the time he was supposed to have given the money to Brock in Hyden, around seven o'clock Sunday night before the election, he was not in Hyden and did not reach there until approximately 9:30 that night. When Brock was being cross-examined, Duff asked him several questions, and from one of these questions appellant attempts to show that Duff admitted giving Brock the $5. This is the question: "What did I say to you when I give you them five one dollar bills?" In view of appellee's testimony denying that he gave Brock or anyone else any money, or asked anyone to give money to any person for him, and in view of the line of questions which were put to Brock by Duff, it is reasonable to assume that Duff was attempting to draw Brock out on the proposition to a point where he could impeach his testimony. Duff was successful in doing this, if we are to accept his testimony and that of I. M. Wooton as to his being out of Hyden at the time he was supposed to have given the money to Brock. On the ground of violating the Corrupt Practice Act we are disposed to, and do, follow the opinion of the trial court to the effect that there was not sufficient evidence to show that the contestee, Duff, violated the Act, or that he had knowl-

edge or gave his consent to such a violation by anyone else.

There is evidence that persons voted over the table in several precincts without being sworn, as required in section 1475 of the statutes. The general practice in such cases seems to have been for an election officer to stamp or mark the voter's ballot as requested. We have frequently condemned such practices when votes are cast over the table; but, in the absence of specific evidence as to the number of such votes and as to how they were cast, we are unable to determine what effect, if any, their being thrown out would have on the outcome of the election. Hill v. Mottley, 142 Ky. 385, 134 S. W. 469; Stice v. Parsley, 217 Ky. 653, 290 S. W. 471; Smith v. Jones, 221 Ky. 546, 299 S. W. 170. In his brief, appellant refers to voting over the table in only Wooton precinct No. 7 and Elkhorn precinct No. 9.

It is claimed that the ballots of 14 persons who voted over the table in the Wooton precinct without being sworn were cast for appellee, and should therefore be deducted from his total vote. On this point W. B. Muncy, clerk of the election in the Wooton precinct, and also a member of the county board of election commissioners, testified as follows:

"9. What size precinct is Wooton Precinct, voting precinct? A. There are near four hundred somewhere in there.

"10. Were you present at the court house and saw fourteen ballots appearing to have been marked with a pen under Curt Duff's picture or in the square and maybe other places and do you know whether or not you marked them ballots with your pen? A. Well, sir, it looked like I did from the appearance of the writing.

"11. If I understand you, these ballots that were marked were people's ballots that couldn't mark their own ballot? A. Yes.

"12. Describe what method was used, how did you do after they come in? A. When the voters come in to vote the Judge would hand them a ballot and they would put in their excuse that they couldn't see to make their ballot or couldn't read or write and when that happened why they just brought their ballots back to the Clerk's table and *vited* and I marked them with a pen.

"13. Did you swear any of those voters before you cross marked them in the presence of the other officers. Did you swear them to the fact that they couldn't make their ballots? A. No, sir, it hadn't been a custom there.

"14. You didn't swear any of them? A. No, sir."

On cross-examination Muncy testified that he had been a resident of the Wooton precinct for about 25 years and that he was familiar with nearly all of the voters in the precinct. He stated that he marked the ballots as directed by the persons desiring to vote over the table. He stated further that he remembered marking ballots for several persons, but that he did not remember how many, and that he did not remember how they voted in the sheriff's race. It was not shown definitely that these 14 votes were the only ones cast by persons voting over the table in the Wooton precinct. Furthermore, it appears that these particular ballots were called to Muncy's attention when the votes were being counted at the court house. He did not say definitely that he marked these ballots; but stated that, "it looked like I did from the appearance of the writing." Granting, without deciding, that these 14 votes should be deducted from appellee's total vote, we find that the outcome of the election would not be changed since appellee received 141 more votes than did appellant.

The evidence presented in regard to voting over the table in the Elkhorn precinct is less definite than that in regard to the Wooton precinct. Allen Gay, clerk of the election in that precinct, testified that none of the persons voting over the table were sworn, and that in his best opinion and judgment about 25 or more persons voted in that manner, and that he thought most of them voted for appellee. He stated further that he remembered that one person voted over the table for Revis, but that he could not remember how many more voted for him. He testified also that the sheriff of the election stenciled the ballots of the persons voting over the table. John D. Barger, challenger at the Elkhorn precinct, testified in answer to the question, "About how many people voted over the table?" as follows, "I would make a bad guess at it, of course there was around 25 or 30 maybe, just to guess at it." He called the names of nine persons who voted over the table, but he did not specify

as to how they voted. He stated, however, that the "biggest majority" of the persons voting over the table in Elkhorn precinct voted for Duff. While we are not disposed to approve any method of voting over the table, other than as required in section 1475 of the statutes, the evidence presented here furnishes no basis upon which we would be justified in holding that 24 votes be deducted from appellee's total vote, as is urged by appellant, because of the indefinite testimony as to the number and the manner in which votes were cast over the table in the Elkhorn precinct.

We come now to the question as to the manner in which the election was conducted in Hyden Precinct No. 1. Appellee received 204 votes in this precinct, while appellant received only 99 votes, thereby giving appellee an advantage of 105 votes. We have noted that appellee insists that the vote in this precinct be thrown out, and the votes cast for both parties be disregarded, because the voters were required to mark their ballots in a small room in which there were no voting booths or partitions. The arrangement for voting in this precinct was for the voter to go into the county judge's office in the court house in Hyden where he received his ballot, and then on through an open door into the adjoining grand jury room to mark his ballot. There was a long bench in the grand jury room and stencils and pads were placed on it for the use of the voters. During most of the day there were two voters in the room at the same time, and there is some evidence that there were as many as three in the room on several occasions. Witnesses testified that they saw or could have seen the ballot of the other person voting in the grand jury room at the time they were there. One lady testified that she asked her daughter, who was in the voting place at the time she was there, to mark her ballot for her because she had failed to bring her glasses along and could not see the ballot very well.

Appellant's son was a challenger at this precinct. He testified that he was the only challenger present. He stated that a big vote was cast in the precinct, and that on several occasions he helped the sheriff keep voters from coming into the county judge's office from the hallway. He stated also that several persons voted over the table without being sworn, and that he thought most of them voted for appellee, though some of them voted for his father. It appears from the record that very few of

the voting precincts in Leslie county are arranged and equipped, as required by the statutes, for the convenience of the voters in voting secretly. Few. if any of them have voting booths. There is also testimony to the effect that there were instances other than in Hyden No. 1 where voters went into a room adjoining the one in which election officers were located to mark their ballots. In other instances, the voters were directed to go to the back of a room in which the election officers were located, where places were arranged several feet apart for the voters to mark their ballots. We have frequently condemned such practices because they do not meet fully the requirements for permitting a voter to cast a secret ballot. We have been mindful, however, of the difficulties frequently encountered in providing suitable voting places, and where we have found substantial compliance with the requirements for secret voting and an absence of intimidation or fraud we have held the election to be valid. Jones v. Steele, 210 Ky. 205, 275 S. W. 790. While there was no material showing of any attempt to intimidate or influence the voters because of the conditions under which they were required to vote in Hyden precinct No. 1, we would be constrained to throw out the election in that precinct if we followed strictly the rulings found in Hill v. Mottley, supra, and in Johnson v. Hall, 275 Ky. 395, 121 S. W. (2d) 935. In the Johnson Case the vote in one precinct was thrown out because several voters were permitted to be in the room where ballots were marked at the same time, the election officers being in an adjoining room. In this connection, appellant in his brief urges that only the election in Hyden Precinct No. 1 be thrown out primarily because of the arrangement under which voters were required to mark their ballots. We have noted, though, that there were other instances where similar irregularities were evident. Granting without deciding, however, that the vote in Hyden Precinct No. 1 should be thrown out and disregarded, it is to be noted that this would have no effect on the outcome of the election; nor would the outcome be affected if the 14 votes complained of in the Wooton precinct should be thrown out also.

On the question of the sufficiency of appellee's petition to have his name placed upon the ballot for the general election as a candidate for sheriff of Leslie county, we have seen that appellee's right to have his

name placed upon the ballot as an independent candidate was upheld by this Court in the case of Revis v. Keen, supra. Since appellant had an opportunity to see the list of appellee's petitioners prior to the time he filed the suit just mentioned, the trial court correctly held that appellant was estopped from questioning the sufficiency of appellee's petition in this action. The following quotation from the case of Newhall v. Mahan, Secretary of State, 245 Ky. 626, 54 S. W. (2d) 26, is applicable to the case at bar [page 28]:

> "It is an ancient and universal rule that a final judgment, rendered on the merits by a court having jurisdiction of the subject-matter and parties, is conclusive on the rights of the parties and their privies in another suit on the points and matters in issue in the first. Prewitt v. Wilborn, 184 Ky. 638, 212 S. W. 442. It is an estoppel not only upon the points which the court was actually required by the parties to form an opinion and pronounce judgment, but to every point which properly belonged to the subject being litigated and which the parties by reasonable diligence might have brought forward. [Cases cited.]"

Furthermore, it is to be noted that neither the name of I. M. Wooton nor that of Sim Morris was placed upon the ballot in the general election. Granting, therefore, that the same 41 persons signed petitions for Wooton, Morris and appellee, and that if these names should be deducted from appellee's petition, there would remain only 86 names thereon, this fact of itself would not make appellee's petition defective because he was actually the only independent nominee whose name was placed upon the ballot for the office of sheriff in the general election.

In connection with appellant's contention that the trial court did not decide the case upon the pleadings and proof, but disregarded the pleadings and rendered his judgment on proof not sustained by the pleadings, we have examined the record carefully and we fail to find that the judgment of the lower court is prejudicial in any substantial manner to appellant's rights.

We are constrained to hold, therefore, that the judgment of the lower court should be, and it is, affirmed.