# Kobs v. Ross et al.

June 23, 1944.

Leonard C. Fielder, John W. McKenzie and Davis M. Howerton for appellant.

E. Poe Harris and Strother Hynes for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellant, plaintiff below, challenged the results of a local option election held in Boyd County on October 2, 1943. Appellees are members of the County Election Commission, defendants below, and Garis T. Long, permitted to defend. KRS 242.120. His pleading was in

the nature of intervening petition, answer, counter-claim and cross-petition, in which he denied and set up grounds of counter contest.

At the outset we may say that there are not presented any technical questions involving the pleadings, nor such as related to the manner of petitioning for or calling the election. The only charges urged by appellant in brief relate to the manner of conducting the election in certain precincts, and a challenge to votes counted by the officers, which he claims were illegally cast and counted.

The commissioners certified that the drys had received 5,472 votes and the wets 5,230, a dry majority of 242 votes. The chancellor in a memorandum order, without specification as to precincts, found that of the persons charged in the petition as having illegally voted, ninety were disqualified, and he struck two ballots from the vote in favor of the wets, thus leaving the dry majority 154. He further held that the evidence produced by contestant was insufficient to justify a change of certified results in precincts numbers 12, 13, 15 and 51, except as to the individual votes theretofore stricken and included in the memorandum. Again, there were not a sufficient number of ballots from which the officers failed to remove the primary stubs in one precinct, or where the ballots were found in a bunch, to alter the result of the election, if the charges be sustained, and this plea was disregarded. The court summarized and in concluding found the dry majority to have been as above and dismissed contestant's pleadings.

While there were more than 150 witnesses testifying for contestant, the evidence making up about 900 pages of transcript, our labors have been lessened by the frank statement of counsel for contestants who have epitomized the issues presented. In closing their brief, after noting that the court struck a net of 88 individual ballots of those who had voted dry, disqualified for various reasons, contestant contends that there should be stricken from the dry total 164 additional votes, which would result in giving the contestant the election by 10 votes.

The precincts challenged as a whole, and the number of votes sought to be stricken, are Bolts Fork No. 12, 56; East Fork, No. 13, 44; Coalton, No. 15, 34; and Gatrell

Hill, No. 51, 30 votes. The challenge in each of the first two precincts is based on the charge that in neither of them was there supplied by the proper officers an appropriate room with a sufficient number of booths or compartments so arranged as to permit the voters to mark their ballots "screened from observation." KRS 118.060, and in violation of sec. 147 of the Constitution, which requires the ballots to be marked in private at the polls.

In No. 12 the vote was 65 dry and 5 wet. Henry Ross voted in this precinct. The voting was in a small one-room schoolhouse. He said there were no booths provided, and the voters were marking ballots on a shelf near the door leading into the school room. That there were a number of dry workers standing on the outside and near the window, watching to see the manner in which the ballots were being cast. He said he could see how they were cast. One voter told him he would not vote because there was no secrecy. Those who were present and "interested" could see how the votes were cast. On cross-examination he admitted that there had been stretched a curtain between the sides of the building which screened the voter from the election officers, but that persons near the window could see how the votes were cast. One witness in substance corroborates him.

For contestee some three or more witnesses testified that there was, in one corner of the school room, a small cloak room about 4 x 10 feet, separated from the main part of the room by a four-inch board partition. One end of the cloak room was open for the purpose of entrance. It is shown that the voters went into this closet, one at a time to mark their ballots. Mr. Ross had estimated that near the end of the shelf there was a window about 3 feet above the ground level, where he and others stood watching the voters casting their ballots.

Proof for contestee showed that the only window on the same side of the schoolhouse, as was the cloak room, was over 7 feet above the highest point on that side of the schoolhouse, this from actual measurements, and the voting shelf was 17 inches lower than the bottom of the window, which would make it extremely difficult for one to see how a voter marked his ballot. In fact several persons named by Mr. Ross as having been able to see through the window, said it was a physical

impossibility to see how a ballot was voted. Mr. Ross had also testified that it was possible for a person standing at a window on the side of the school room, opposite from the cloak room, to see the voters' movements. This window, by measurement, was shown to have been more than 18 feet from the cloak room, and it was shown to be impossible for one at this window to see how a voter marked his ballot.

The claim that persons inside the building could also observe the voter in marking his ballot, was contradicted by a number of witnesses some of whom thought it possible to do so if a deliberate attempt was made for the purpose, and there is no showing that such was the case. It is shown that all challengers remained on the outside of the schoolhouse; only two voters were allowed in the room at one time, and when two voters were in the room at one time, one would be kept at the officer's table until the other had left the cloak room. There was no proof that any one, voter or otherwise, stopped at the end of the cloak room in an effort to see how a ballot was being marked. This conflicting evidence, with the preponderance on the side of contestees, presented purely a question of fact for the determination of the chancellor, that is, as to whether under the facts there had been a sufficient compliance with the statutes as to afford the required secrecy of the ballot.

The voting in East Fork was likewise in a one-room schoolhouse, said by contestant's witnesses to be about 25 x 20 feet. The election officers were at one end around the teacher's desk. There were no booths or curtains. The ballots were stamped on an ordinary school desk about 3 feet from a window which was on the side of the schoolhouse. Two witnesses went no further than to say that persons standing outside near the window might have seen how the voter was casting his ballot, in other words the voting was in the open.

Witnesses for contestees said the house was 30 feet long; that the desk was placed against a blank wall on one side, and a bookcase which screened one side of the desk had been placed on the other side. By actual measurement the window was 5 feet from the desk and the book case blocked the view from the window. Actual tests under similar conditions were made and demonstrated that it was impossible to look through the window and see how a ballot was prepared. The officers of the

election testified that voting was so conducted that no one in the building, including the officers, could see the voter mark his ballot. The most that could be concluded in either precinct discussed was that there was an opportunity for persons inclined, to see the voting process.

The court held as to these precincts that the evidence was insufficient to show any illegal voting, and that under the proof there was substantial compliance with the statutory and constitutional provisions. Counsel for contestants insist that under our ruling in Smith v. Jones, 221 Ky. 546, 299 S. W. 170, the two precincts should be disregarded. In that case it may be noted that we did condemn the loose practice of not supplying proper places where the vote could be marked secretly. But a casual reading will show that there was gross fraud and illegal practices, and the situation was not such as to afford as much secrecy as existed in two precincts in question. We cited the Smith case in Revis v. Duff, 275 Ky. 626, 122 S. W. 2d 518, where there was evidence of voters marking their ballots openly without being sworn, but held that in the absence of evidence showing the number of votes so cast, we were unable to say what effect the throwing out of the ballots would have on the outcome. This is not true here. A reference to Felts v. Edwards, 181 Ky. 287, 204 S. W. 145; Pace v. Reed, 138 Ky. 605, 128 S. W. 891; Jones v. Steele, 210 Ky. 205, 275 S. W. 790; Alsip v. Perkins, 236 Ky. 5, 32 S. W. 2d 565, will show that under the facts here the chancellor's conclusion was correct that in these two precincts there was substantial compliance.

It becomes evident at this point that if the other precincts challenged should be thrown out because of alleged general irregularities, the only result would be a reduction of the total dry majority. Nevertheless we have carefully considered the proof and arguments in respect of Gatrell and Coalton precincts, and find, as did the chancellor, that there was only shown a suspicion of illegal voting; no more than an opportunity to commit fraud or allow illegal voting. The charge in Gatrell was that there was evidence of a block voting of what two counters or tabulators estimated to be a bunch of 30 dry votes.

The preponderance of the proof showed that these supposed "block" votes were placed in a bunch by the first counters who did not tally but merely separated

the wet and dry votes into packs, and the box and ballots were taken to another table, rechecked, tally sheets filled in and certified by the second counters. This was shown to be the custom in counting the vote. There was shown no illegal voting, fraudulent or corrupt practices in this precinct, and the integrity of the ballot box was proven.

In other precincts challenged some ballots were issued with the primary stub attached; these were delivered to the counting tables in this condition, and the primary stubs removed, and the votes counted. In one precinct the secondary stub was removed by the officer and placed on a string, apparently innocently done in the belief that the law required this proceeding. In neither of these precincts was there shown any chain voting, which contestant argues was possible by the method pursued; nor were there any irregularities shown in the voting, with the possible exception of voting by disqualified persons. The proof as adduced justified the chancellor in declining to eliminate these precincts.

Contestant contends that the election was not free and equal under the provisions of sec. 147 of our Constitution, because of the great, or at least substantial number of legal voters of Boyd County who were absent in the armed service of the United States, and thus unable to vote. Further, that contestant, legally engaged in the intoxicating beverage business, was by the result of the election deprived of property rights without due process of law, contrary to amendments of the Constitution of the United States. These contentions were recently considered and negatively answered in Karloftis v. Helton, 297 Ky. 463, 178 S. W. 2d 959.

Judgment affirmed.

Whole Court sitting.